UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOHN JAMES MCGRATH, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:14-CV-193 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| | § | |
| Defendant. | § | |

## AMENDED MEMORANDUM AND RECOMMENDATION[1]

Plaintiff John James McGrath brought this action on May 27, 2014, seeking review of the Commissioner's final decision determining he was not disabled. (D.E. 1). On October 30, 2014, Plaintiff filed a motion for summary judgment.[2] (D.E. 14). On December 1, 2014, Defendant filed a Motion for Summary Judgment. (D.E. 15). For the reasons that follow, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, the Commissioner's determination be **AFFIRMED**, and Plaintiff's cause of action be **DISMISSED**.

---

[1] The undersigned referenced treatment notes in a May 7, 2015 Memorandum and Recommendation ("M & R") which belonged to someone other than Plaintiff and were inadvertently included in the administrative record of this case referenced by the parties. The amended M & R addresses only Plaintiff's records. Further, the undersigned has considered only those arguments which reference Plaintiff's treatment records.

[2] The undersigned construes "Plaintiff's Brief in Support of Claim" as a Motion for Summary Judgment.

# I.  JURISDICTION

The Court has jurisdiction over the subject matter and the parties pursuant to 42 U.S.C. § 405(g).

# II.  BACKGROUND

Plaintiff protectively filed his application for Disability Insurance Benefits ("DIB") on June 10, 2011, alleging disability as of May 2, 2011, due to various physical ailments including leg and hip ailments as well as thyroid cancer. (D.E. 11-6, Page 2 and D.E. 11-7, Page 6).

Plaintiff's application was denied upon initial consideration and was again denied upon reconsideration.   (D.E. 11-4, Pages 2-3 and D.E. 11-5, Pages 2 and 8).   At Plaintiff's request, a hearing was held before an administrative law judge ("ALJ") on February 5, 2013 at which Plaintiff, two medical experts, and a vocational expert ("VE") testified.  (D.E. 11-3, Pages 35-65).  The ALJ issued an unfavorable decision on April 9, 2013, finding Plaintiff not disabled.  (D.E. 11-3, Pages 15-30).  Plaintiff requested the Appeals Council review the ALJ's decision, and the Appeals Council denied his request for review on March 27, 2014, making the ALJ's determination the final decision of the Commissioner under 42 U.S.C. § 405(g).  (D.E. 11-3, Pages 2-4 and 13-14).  Plaintiff timely filed this action on May 27, 2014, seeking a review of the Commissioner's final decision.  (D.E. 1).

# III.  SUMMARY OF THE EVIDENCE

The undersigned has reviewed all of Plaintiff's treatment notes in the record. Plaintiff correctly points out in his objections to the M & R (D.E. 18) that the original M

& R considered medical records which did not belong to Plaintiff.  (D.E. 18).  Counsel for Defendant submitted a certified electronic copy of the transcript of the administrative proceedings in accordance with section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).  (D.E. 11).  Included in these records were medical records of William Dwight Webb, a person other than Plaintiff.  (D.E. 11-15, Pages 82-134; D.E. 11-16; D.E. 11-17). How Mr. Webb's medical records came to be included in the transcript of the administrative proceedings has not been explained by Defendant.  While Defendant's citations to the wrong medical records were limited (D.E. 16, Pages 4-6), Plaintiff did not object to these erroneous record citations or otherwise call the erroneous inclusion of Mr. Webb's records to the Court's attention until filing objections to the M & R.  However, for purposes of this Amended Memorandum and Recommendation, the undersigned has only considered *Plaintiff's* medical records.  Further, only those medical records most relevant to the pending issues raised are included below, specifically those records related to Plaintiff's hip ailments and Plaintiff's thyroid cancer and resulting fatigue.

Plaintiff, at the time his application was filed, was 47 years old with two years of college as a business major and past relevant work as a manager, assistant manager and counter sales person for equipment rental and auto parts.  (D.E. 11-6, Page 2 and D.E. 11-3, Page 28).

In 2008, Plaintiff was diagnosed with thyroid cancer and underwent a thyroidectomy and radiation treatment in April 2008 with no recurrence of cancer.  (D.E. 11-3, Page 26 and D.E. 11-13, Page 17).  In May 2009, Plaintiff underwent a left total hip

replacement and in August 2009,[3] Plaintiff underwent a right total hip replacement. (D.E. 11-8, Page 39 and D.E. 11-10, Page 7).

On March 11, 2011, Plaintiff was treated for general tiredness and easy fatigability. (D.E. 11-10, Page 63). Plaintiff's testosterone levels were to be checked before his next appointment. (D.E. 11-10, Page 65).

On May 3, 2011, Plaintiff was treated for a constant cough and for coughing up blood at an urgent care center in Rockport, Texas. (D.E. 11-8, Pages 9 and 15). Plaintiff was noted as having abnormal breathing sounds, smoking ½ pack of cigarettes per day, and normal gait and posture. (D.E. 11-8, Pages 9-11). Plaintiff further denied any joint pain, muscle pain or swelling. (D.E. 11-8, Page 9). Plaintiff was admitted to the San Antonio VA Hospital[4] ("VA Hospital") for treatment of bronchopneumonia and released on May 14, 2011. (D.E. 11-8, Page 11 and D.E. 11-9, Page 112). Plaintiff was restricted to ambulating with supervision, using a walker for balance, and was prescribed physical therapy two to three times per week for four weeks. (D.E. 11-9, Page 116 and D.E. 11-12, Page 48). On May 18, 2011, Plaintiff was treated as a follow up to his discharge and is noted as walking with a cane and feeling well but weak and denying any pain. (D.E. 11-10, Pages 47 and 49). Further, Plaintiff received home care services from May 19, 2011 through July 17, 2011. (D.E. 11-14, Page 6). Throughout this time, Plaintiff was noted by his home health nurse as having pain in both of his hips with prolonged activity,

---

[3] Records conflict as to whether Plaintiff's initial right hip replacement was in August 2008 or August 2009.
[4] Plaintiff did not have health insurance and therefore, drove to San Antonio, Texas to seek treatment from a VA facility. (D.E. 11-9, Page 113). However, Plaintiff resides in Rockport, TX.

using a cane when ambulating at home, having recently fallen in the home and being prone to falls.   (D.E. 11-4).   Further, Plaintiff was noted as have limited mobility endurance, left hand/wrist pain, impaired mobility, an unsteady gait and using a walker. (D.E. 11-14, Pages 8 and 10).   In June 2011, Plaintiff reported he was "getting better every day" and "getting stronger."   (D.E. 11-14, Pages 33 and 37-38).

On June 2, 2011, Plaintiff reported numbness and intermittent stabbing pain in the two fingers in his left hand.   (D.E. 11-11, Page 44).   Plaintiff reported pain medication did not relieve the pain, which was eight on a scale of ten.   (D.E. 11-11, Page 46).

On June 3, 2011, Plaintiff was prescribed a wheeled walker with hand brakes and a seat.   (D.E. 11-10, Page 43).   Plaintiff was noted as having recovered completely from pneumonia and being concerned about low libido.   (D.E. 11-10, Page 44).   It is further noted that Plaintiff's last testosterone level was low and this could have been due to his recent illness.   (D.E. 11-10, Page 45).

On June 10, 2011, Plaintiff was noted as having difficulty standing and walking during a face to face appointment with an SSA interviewer.   (D.E. 11-7, Page 3). Specifically, Plaintiff was noted as using a cane to assist with walking and having to stretch during the interview.

On June 17, 2011, Plaintiff was treated for numbness in two fingers in his left hand, reporting it had been an issue for the previous two weeks.   (D.E. 11-11, Page 11). Plaintiff was found to have a left ulnar neuropathy possibly due to a traumatic IV stick. (D.E. 11-11, Pages 15 and 40).   It was noted Plaintiff's condition would most likely improve over time and would take several months for nerve recovery to take place.

On June 25, 2011, Plaintiff reported he was limited in all of his actions and had limited energy throughout the day.  (D.E. 11-7, Pages 34-35 and 42).  He reported he lives with his wife, takes care of his pets with the assistance of his wife, takes care of his personal needs without assistance, prepares food or meals one to three times weekly without standing too long, performs household repairs, yard work and automotive maintenance not requiring constant bending, lifting or crawling and when he has the energy, drives a car, shops for necessities, fishes and hunts one to three times a month when he has the energy, no longer engages in social activities because of his decreased energy and physical limitations, and could walk one block before needing a three to five minute break.  (D.E. 11-7, Pages 35-42).

On July 14, 2011, Plaintiff was treated for an intermittent cough and shortness of breath which Plaintiff reported had been occurring since May 3, 2011.  (D.E. 11-8, Page 12).  Plaintiff was noted as having denied any joint pain, muscle pain or swelling and continuing to smoke ½ pack of cigarettes per day.  (D.E. 11-8, Pages 12-13).  Plaintiff was also noted as having a normal gait and posture.  (D.E. 11-8, Page 13).  Plaintiff's pneumonia is noted as being resolved with no acute disease and Plaintiff was instructed to return in three days if he was not better.  (D.E. 11-8, Pages 13-14 and 16).

On July 27, 2011, Dr. Dennis Gutzman, an orthopedic surgeon, noted Plaintiff chief complaint was bilateral hip pain.  (D.E. 11-8, Page 39).  Dr. Gutzman expressed concern that Plaintiff's hip replacements were failing and ordered diagnostic tests of both Plaintiff's hips as well as testing for levels of cobalt and chromium.

On August 8, 2011, a disability consultative examination was performed. (D.E. 11-8, Pages 18-25). Plaintiff was noted as ambulatory with a slow gait, favoring the right side, and using no assistive devices. (D.E. 11-8, Pages 21-22). Further, Plaintiff was unable to stand on heels and toes on his right side, had restricted range of motion and tenderness with no edema or crepitation in both hips, and lower back pain when bending forward. (D.E. 11-8, Page 22). Plaintiff was also noted as have clear lungs, a normal range of motion in both shoulders, elbows, wrists and hands, and normal hand manipulation. (D.E. 11-8, Pages 21-23). Further, Plaintiff's left hip was noted, when compared to images from September 13, 2010, as having no radiographic change with excellent placement of the prosthetic parts, anatomic alignment, and without acute complication. (D.E. 11-8, Pages 24, 50 and 55). Plaintiff's right hip prosthesis was noted as in anatomic alignment and without acute complication. (D.E. 11-8, Pages 48 and 54). Plaintiff's lungs were also noted as normal with no pleural fluid. (D.E. 11-8, Page 25).

On September 2, 2011, Dr. Gutzman noted Plaintiff's pain in both his right and left hip, with more pain in the left, and that Plaintiff had elevated levels of chromium and cobalt. (D.E. 11-8, Pages 37 and 51-52). Dr. Gutzman further noted Plaintiff would need both left and right hip revision surgery because of these elevated levels. (D.E. 11-8, Page 62). The same day, Plaintiff was treated at the VA Hospital for his thyroid therapy. (D.E. 11-10, Page 39). Treatment notes again indicate Plaintiff's testosterone level on June 3, 2011, was low but was possibly due to his acute illness during that time. Plaintiff

continued to receive therapy at the same dose with treatment notes indicating an increase would be considered at the next visit.  (D.E. 11-10, Page 42).

On September 6, 2011, Dr. Laurence Ligon completed an RFC assessment opining Plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand and/or walk about six hours in an eight hour workday, sit (with normal breaks) for about six hours in an eight hour workday, was unlimited in his ability to push and/or pull, could occasionally climb ramps, stairs but never ladders, rope, and scaffolds, could occasionally balance, stoop, kneel, crouch and crawl, and had no manipulative, visual, communicative, or environmental limitations.  (D.E. 11-8, Pages 26-33).

On October 4, 2011, during an exam to aid in the determination of Plaintiff's application for VA disability benefits, Plaintiff reported having pain in both hips for approximately six to seven years, favoring one leg to the other, and that while he had be doing well the first year after the replacement, he developed shooting pains in his left hip which had been getting progressively worse and that his right hip bothered him when he overexerted himself.  (D.E. 11-9, Page 127).  Plaintiff also reported pain if he stepped wrong or if there was inclement weather.  Plaintiff was noted as having a limited range of motion in both hips, hip pain in both hips, excessive fatigability in both hips, and interference with sitting, standing and/or weight bearing in both hips.  (D.E. 11-9, Page 128 and D.E. 11-10, Pages 2-5).  Plaintiff is noted as occasionally using a cane to ambulate.  (D.E. 11-10, Page 8).  Plaintiff further reported his hip condition prevented him from standing or walking for long periods, impacting his ability to work.  (D.E. 11-10, Page 10).  It is noted that Plaintiff's condition "carries a functional impairment due to

pain and limited range of motion which would prevent physical forms of employment but would not prevent or limit sedentary forms of employment." (D.E. 11-10, Page 10).

On October 14, 2011, Plaintiff reported he was scheduled to have bi-lateral hip revision surgery in October 2011 and January 2012 which would severely limit his mobility and his ability to care for himself. (D.E. 11-7, Page 44). On October 22, 2011, Plaintiff underwent a total left hip revision surgery performed by Dr. Gutzman. (D.E. 11-8, Pages 40-41). On October 24, 2011, Plaintiff was discharged and told to use a walker when ambulating. (D.E. 11-8, Page 114). On October 31, 2011, Dr. Gutzman noted Plaintiff's left hip wound sites were well-healed with no signs of infection. (D.E. 11-8, Page 36). Dr. Gutzman recommended Plaintiff walk more using a walker to increase his weight bearing status and scheduled a follow-up appointment.

On November 25, 2011, Plaintiff was treated for his thyroid therapy. (D.E. 11-9, Page 122-126). Plaintiff stated "he is doing well on the testosterone and has more energy." (D.E. 11-9, Page 123). The same dose of testosterone was continued. (D.E. 11-9, Page 126). Plaintiff further stated he has some pain in his left hip which is "controlled somewhat" with pain medication. Plaintiff was noted as having a limited range of motion in his hip and using a cane for ambulation. (D.E. 11-9, Page 124).

On December 20, 2011, Dr. Gutzman opined:

> From an orthopedic standpoint, taking into account the fact that Mr. McGrath has undergone two total hip replacement surgical intervention procedures and now a left total hip revision and he has another hip revision procedure scheduled to be performed on the right side, there is no reasonable expectation that Mr. McGrath will be able to gain and maintain meaningful employment for at least one year. In that regard he is considered disabled. He has been using medications on a regular basis for

management of his pain symptoms and has been ambulating with a cane.
(D.E. 11-8, Page 58).

Dr. Gutzman also noted Plaintiff's cobalt and chromium levels remained high but were

lower than prior to his left hip revision.  Plaintiff reported his left hip pain had improved

and he still had right hip pain.  (D.E. 11-8, Page 59).

On January 11, 2012, Plaintiff reported to Dr. Gutzman that his left hip felt much

better, his right hip caused some pain, and he had to use a walker to ambulate.  (D.E. 11-

8, Page 86).  On January 13, 2012, Plaintiff underwent a total right hip revision surgery

performed by Dr. Gutzman.  (D.E. 11-8, Page 85).  On January 16, 2012, Dr. Gutzman

noted Plaintiff's right hip wound sites were without signs of infection and placed Plaintiff

on "no work status."  Further, Plaintiff was discharged and told to ambulate daily with a

walker as tolerated at least three times per day.  (D.E. 11-8, Page 94).

On January 23, 2012, Dr. Gutzman opined:

> Mr. McGrath, who has now undergone four hip operations including
> revisional surgical interventions, cannot be expected to gain and maintain
> any type of meaningful employment.  He is utilizing crutches to mobilize
> and he is utilizing medications for pain management on a regular basis.  He
> cannot sit or stand for greater than 30 minutes at one time without a 10
> minute rest period of time.  He should not be utilizing stairs.  He should not
> be walking on inclined surfaces.  He should not perform any climbing
> activities and is restricted.  With this level of restrictions it is not reasonable
> to presume that Mr. McGrath can obtain work and certainly even if he
> could obtain work, he will not be able to maintain the requirements of even
> the most sedentary type of employment.  (D.E. 11-8, Page 128).

Dr. Gutzman noted Plaintiff's right hip wound sites were well-healed with no

signs of infection and that Plaintiff was starting to walk better using crutches to mobilize.

(D.E. 11-8, Page 129).  Dr. Gutzman recommended a follow-up visit in eight weeks.

On February 1, 2012, Plaintiff was treated at the Corpus Christi Veterans Outpatient Clinic, reporting that he was "doing well." (D.E. 11-11, Page 25). However, Plaintiff also reported pain as 7 out of 10 in his right hip, requested a pain medication refill and was noted as having an antalgic gait and walking with a cane. Plaintiff was advised to continue therapy and pain management. (D.E. 11-11, Pages 25-26).

On February 8, 2012, Dr. Shabnam Rehman completed an RFC assessment opining Plaintiff could occasionally lift 20 pounds, frequently lift ten pounds, stand and/or walk about two hours in an eight hour workday, sit (with normal breaks) for about six hours in an eight hour workday, was unlimited in his ability to push and/or pull, could occasionally climb ramps, stairs but never ladders, ropes, and scaffolds, could occasionally balance, stoop, crouch and crawl and frequently kneel, and had no manipulative, visual, communicative, or environmental limitations. (D.E. 11-8, Pages 138-145). Dr. Rehman noted Plaintiff was unable to work due to bilateral hip surgeries, had to use crutches and take pain medication in the post operation stage, and the RFC restricted Plaintiff on the basis of objective evidence while accounting for expected improvement and expected residuals after the revision surgery. (D.E. 11-8, Pages 144-145).

On February 24, 2012, an ultrasound showed Plaintiff had a lesion in his right thyroid lobe surgical bed. (D.E. 11-9, Page 7). Plaintiff is noted as, "Recently had Rt hip replaced—doing well—denies any new complaints." (D.E. 11-9, Page 119). Plaintiff is further noted as walking with a cane. (D.E. 11-9, Page 120). On March 6, 2012, an ultrasound showed Plaintiff's previously enlarged lymph node had decreased in size and

no biopsy was recommended.  (D.E. 11-9, Page 3).  Plaintiff is noted as ambulatory and reporting a pain level of 0.  (D.E. 11-13, Pages 35-36).  On March 8, 2012, Plaintiff was told the lesion had shrunk and would be monitored.  (D.E. 11-9, Page 118).

On March 28, 2012, Plaintiff was treated by Dr. Gutzman for follow up care for both of his hips.  (D.E. 11-12, Page 108).  Plaintiff's hip replacements were in the proper positions with no loosening.  Plaintiff reported he was walking with less pain but was still using a cane.  Plaintiff's cobalt and chromium levels were noted as normal with definite improvements.  Dr. Gutzman also noted Plaintiff had permanent restriction documents filled out for him, as detailed below, and that, "It is not reasonable for Mr. McGrath to gain and to maintain any meaningful employment based upon going through multiple operations as it is related to his hips."  (D.E. 11-12, Page 108).  Dr. Gutzman stated Plaintiff would need a follow up appointment in approximately six months.

Also on March 28, 2012, Dr. Gutzman completed a physical activities form opining Plaintiff could walk 50 feet without rest, could sit and/or stand/walk less than two hours in an eight hour workday (with normal breaks), must be able to shift positions from sitting, standing or walking at will, would need to take four unscheduled 15 minute breaks during an eight hour workday, could frequently lift and carry less than ten pounds, occasionally lift and carry ten pounds, and never lift and carry twenty or fifty pounds, had no manipulative restrictions, could bend and twist at the waist no more than five percent of an eight hour workday, should avoid extreme cold and extreme heat, could occasionally twist, stoop(bend), crouch, climb stairs, and never climb ladders, and would be absent from work about twice a month.  (D.E. 11-12, Pages 96-98).

On May 4, 2012, Plaintiff was treated at the VA Hospital and was again noted as "Recently had Rt hip replaced—doing well—denies any new complaints." (D.E. 11-13, Pages 29 and 33). Plaintiff further reported he was feeling well except for decreased energy and sexual drive which improved with his medication except the patch medication kept falling off. Plaintiff's testosterone levels were noted as being "on the lower range." (D.E. 11-13, Page 31). Plaintiff's testosterone medications were adjusted, specifically adding androgel as Plaintiff reported the patch medication continued to fall off. (D.E. 11-13, Pages 23 and 26). Plaintiff was noted as walking without assistance. (D.E. 11-13, Page 32).

On August 24, 2012, Plaintiff's testosterone levels were again noted as being "on the lower range." (D.E. 11-13, Page 23). The record indicates Plaintiff's medications had not been adjusted to include androgel as previously recommended on May 4, 2012 and Plaintiff continued to report his patch medication was falling off. Plaintiff was advised to begin using androgel.

On September 26, 2012, Plaintiff was treated by Dr. Gutzman for follow up care for both of his hips and to review his lab results. (D.E. 11-12, Page 107). His laboratory results for chromium and cobalt were within normal limits and Plaintiff reported "[h]e is doing better in terms of his hip and he is now more active." (D.E. 11-12, Page 107). Dr. Gutzman stated Plaintiff would need to be seen on as needed basis going forward.

On November 30, 2012, Plaintiff reported he was using his testosterone medication without issue and he did not have a decreased libido or decreased strength or endurance. (D.E. 11-13, Page 17). Plaintiff further reported significant improvement of

his symptoms with use of his current medications, including androgel.  (D.E. 11-13, Page 20).

On December 5, 2012, Plaintiff stated his left hand continued to cause pain.  (D.E. 11-15, Page 41).   Plaintiff further denied a change in energy level or weakness. Plaintiff's chief complaint was chronic pain in his hips and knees which he assessed as five out of ten.  (D.E. 11-15, Page 44).

On February 5, 2013, a hearing was held before the ALJ.  (D.E. 11-3, Pages 35-65).  Dr. Sharon Rogers, having reviewed Plaintiff's medical records, testified Plaintiff's ailments were primarily physical and Plaintiff had no non-exertional limitations.  (D.E. 11-3, Page 39).  Dr. George Decherd testified, having reviewed Plaintiff's medical records, Plaintiff did not meet or equal a listing.  (D.E. 11-3, Page 40).  Dr. Decherd opined Plaintiff could lift twenty pounds, carry ten pounds, could stand/walk about two hours changing positions and sitting periodically, could stand/walk for one hour at a time for a total of two hours per day, could not use ladders, scaffolds, ropes, or use dangerous moving machinery and should minimally use stairs, could crouch, bend and kneel occasionally, would require a clean work environment and restricted left hand grip/handling.  (D.E. 11-3, Pages 41-42).  Dr. Decherd further testified that recovery time for Plaintiff's hip surgeries, if properly performed, is approximately six months.  (D.E. 11-3, Pages 43-44).   Dr. Decherd stated Plaintiff's hip replacements "would certainly cause problems for a period of time after the surgery depending on the success he had with the surgery."  (D.E. 11-3, Page 46).

Plaintiff testified he lives with his wife who does not work, he drives very rarely, he goes shopping with his wife to get out of the house and can lift grocery items so long as he did not have to bend to reach them, his hips, primarily his left, ache when it is cold, when he steps down wrong and on days when he is more active, and his pain medication assisted with the pain for a few hours but it caused concentration issues if he took enough to alleviate all of the pain. (D.E. 11-3, Pages 51-55).  Plaintiff also stated he had fallen twice and was very careful standing up and walking.  (D.E. 11-3, Page 58).  Plaintiff further testified that when he performed household chores, he would have to take pain medication and sit on the couch the next day.  (D.E. 11-3, Page 56).  As to his fatigue level, Plaintiff stated he felt "fatigued all the time."  (D.E. 11-3, Page 59).  He further stated he did not go fishing and hunting as often and when he did go fishing, it was for about an hour, it was difficult to walk back and forth in the sand, and he could not stand on the cement pier.  Plaintiff also testified he could not walk for an hour a time and that when he went to the mall with his wife to do Christmas shopping, he had to go sit in the car after a half hour.  (D.E. 11-3, Page 60).

The VE testified that someone with Plaintiff's education and work background who could lift/carry 20 pounds occasionally and ten pounds frequently, could occasionally balance, climb, stoop, kneel, crouch and crawl, could stand/walk two hours in an eight-hour workday, could primarily sit, could not climb ladders, ropes, scaffolds, or be at unprotected heights or use dangerous moving machinery, could minimally use stairs, would require a clean work environment free from excessive odors, dust, gases or poor ventilation and had a reduced left hand grip could not perform Plaintiff's past work

because they required too much walking but could perform sedentary, unskilled jobs such as information clerk, surveillance system monitor and call operator.  (D.E. 11-3, Pages 60-61).  The VE further testified these positions could be performed even if there was need for occasional use of an assistive device to ambulate but not if a person required more than two days off per month or to work less than eight hours per day or had difficulty concentrating as much as 25 percent of the day because of the side effects of pain and pain medication.  (D.E. 11-3, Pages 61-64).

On March 18, 2013, Plaintiff was treated by Dr. Gutzman as a follow up to a fall approximately two weeks earlier.  (D.E. 11-14, Page 41).  Dr. Gutzman found Plaintiff's left hip "range of motion is back to his preoperative status" and left hip x-ray films "showed no evidence of any fracture or dislocation."  Dr. Gutzman further noted Plaintiff's "pain level has decreased" and he would need to be seen on an as needed basis going forward.

On April 9, 2013, the ALJ issued his opinion finding Plaintiff not disabled.  (D.E. 11-3, Pages 18-30).  The ALJ found that while Plaintiff's severe impairments included bilateral total hip replacement, COPD and neuropathy, these impairments or combination of impairments did not meet or medically equal a listing.  (D.E. 11-3, Pages 20-21).  The ALJ concluded Plaintiff could perform the jobs as noted by the VE.  (D.E. 11-3, Page 29).

## IV.  STANDARD OF LAW

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the

Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The burden has been described as more than a scintilla, but lower than a preponderance. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). A finding of "no substantial evidence" occurs "only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988) (citations omitted).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citations omitted). It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant

cannot presently perform relevant work.  *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520.  The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step.  *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## V.  DISCUSSION

### A.    ALJ's Determination

In the April 9, 2013 decision, the ALJ followed the five-step sequential process determining that at step one, Plaintiff had not engaged in substantial gainful activity since May 2, 2011.  (D.E. 11-3, Pages 18-30).  At step two, the ALJ found that Plaintiff's severe impairments included bilateral total hip replacement, chronic obstructive pulmonary disease ("COPD") and neuropathy.  The ALJ also determined Plaintiff's post remote carcinoma of the thyroid and thyroid removal, pneumonia with IV antibiotics in 2011 and left testicular torsion were non-severe.  At step three, the ALJ found that Plaintiff's severe impairments did not meet or equal the requirements of any listed impairment for presumptive disability and Plaintiff had the RFC to perform less than a full range of light work.  At step four, the ALJ found that Plaintiff could not perform his past relevant work.  At step five, relying upon the VE's testimony, the ALJ determined Plaintiff was capable of performing other work existing in significant numbers in the national economy and was therefore, not under a disability since May 2, 2011, his alleged disability onset date.

### B.     Issues Presented

Plaintiff contends the ALJ's decision is not supported by substantial evidence as the ALJ erred by:  (1) failing to find that Plaintiff's status-post remote carcinoma of the thyroid and thyroid removal is a severe impairment affecting his ability to perform work-related activities because it causes chronic fatigue and (2) failing to give controlling weight to the opinion of Plaintiff's treating physician, Dr. Gutzman, regarding Plaintiff's limitations as a result of his hip ailments.  (D.E 14, Pages 4-11).

### 1.     Chronic Fatigue

Plaintiff asserts he has suffered chronic fatigue as a result of thyroid cancer and subsequent thyroid removal in 2008 and that the ALJ erred when finding at step two that Plaintiff's status-pose remote carcinoma of the thyroid and thyroid removal was a non-severe impairment.  (D.E. 14, Pages 4-5). While Plaintiff now alleges his fatigue caused concentration issues, Plaintiff fails to cite to any sufficient evidence in the record in support.   Plaintiff cites to his own testimony that despite receiving testosterone replacement therapy, he felt fatigued all of the time as well as treatment notes from January 2010, November 2011, and May 2012 where Plaintiff reported chronic fatigue, improvement after starting testosterone replacement therapy, and then subsequent decreased energy even with treatment.  (D.E. 11-3, Page 59; D.E. 11-12, Page 92; D.E. 11-9, Page 123; and D.E. 11-13, Page 29).  Plaintiff asserts his chronic fatigue affected his ability to perform work related activities, including concentration and the ability to exert himself and it is, therefore, a severe impairment.  The undersigned rejects Plaintiff's

arguments and concludes the ALJ's finding at step two is supported by substantial evidence for the reasons stated below.

The ALJ reviewed Plaintiff's thyroid ailment and noted Plaintiff's testimony that he "experiences constant fatigue caused by removal of his cancerous thyroid, for which he takes medications."  (D.E.  11-3, Page 22).  The ALJ further noted Plaintiff received thyroid replacement therapy and there was no evidence in the record of a reoccurrence of Plaintiff's thyroid cancer.  (D.E. 11-13, Pages 24 and 26).  Additionally, the ALJ noted that "[w]hile Plaintiff testified the medication causes fatigue, it did not prevent him from working after his diagnosis and treatment and prior to his alleged onset date.  Thus, I find no evidence of functional limitations as a result thereof."

The record supports the ALJ's determination that Plaintiff's thyroid ailment was not a severe impairment.  On November 25, 2011, Plaintiff stated "he is doing well on the testosterone and has more energy."  (D.E. 11-9, Page 123).  Approximately six months later, on May 4, 2012, Plaintiff reported he was feeling well except for decreased energy and sexual drive which improved with his medication except the patch medication kept falling off.  Plaintiff's testosterone levels were noted as being "on the lower range." (D.E. 11-13, Pages 29-31).  Plaintiff's medications were adjusted, specifically adding androgel.  (D.E. 11-13, Pages 23 and 26).  On November 30, 2012, Plaintiff reported he was using his testosterone medication without issue and no longer had a decreased libido. (D.E. 11-13, Page 17).  Plaintiff further reported significant improvement of his symptoms with use of his current medications, including androgel.  (D.E. 11-13, Page

20).  On December 5, 2012, Plaintiff denied a change in energy level or weakness.  (D.E. 11-15, Page 41).

While Plaintiff then testified at the February 5, 2013 hearing that he felt "fatigued all the time," the ALJ found Plaintiff's testimony less than credible based on the record. The ALJ, noting he had considered all symptoms to the extent they were consistent with the objective medical evidence, considered Plaintiff's testimony regarding his limitations and found that while his medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence and limiting effects were not credible.  (D.E. 11-3, Page 21).

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).  Subjective complaints must be corroborated, at least in part, by objective medical findings.  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988)(citations omitted); *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985).  The ALJ thoroughly summarized Plaintiff's hearing testimony and the relevant record.  Further, the ALJ noted Plaintiff's activities of daily living did not support his subjective assertions.  (D.E. 11-3, Pages 26-27).  Specifically, the ALJ noted Plaintiff performed a variety of household chores as well as driving, independently caring for himself and fishing.  Further, the ALJ correctly noted Plaintiff was able to work after his thyroid diagnosis and treatment for several years prior to his alleged onset date.  There is no indication Plaintiff's thyroid impairment worsened at or near the time he stopped working.  Conversely, Plaintiff reported improvement of his reported fatigue with

medication as described above.  Additionally, Dr. Rogers testified at the hearing that she reviewed Plaintiff's medical records and found no evidence of non-exertional limitations. (D.E. 11-3, Page 39).   Further, Dr. Decherd testified at the hearing and found no limitations stemming from Plaintiff's thyroid ailment.  (D.E. 11-3, Page 40).

The record shows that the ALJ gave thorough consideration to the evidence in its entirety and found contradictions between Plaintiff's allegations, his testimony and the record.  Therefore, the ALJ's finding at step two is supported by substantial evidence for the reasons stated above.

### 2.  Treating Physician's Opinion

Plaintiff asserts the ALJ erred by failing to give controlling weight to the opinion of his treating physician, Dr. Gutzman, regarding Plaintiff's limitations as a result of his hip ailments.  (D.E 14, Pages 5-11).  For the reasons stated below, the undersigned finds the ALJ's decision is supported by substantial evidence.

Under the regulations, the ALJ should give more weight to the opinions from treating sources because they are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of Plaintiff's impairments and might bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  20 C.F.R. § 404.1527(d).  However, the ALJ can decrease reliance on treating physician testimony for good cause, which includes statements which are brief or conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques or otherwise unsupported by evidence.  *Leggett v.*

*Chater*, 67 F.3d 558, 566 (5th Cir. 1995)(citations omitted).   However, the ALJ must

perform a detailed analysis of the treating physician's view under the criteria set for in 20

C.F.R. § 404.1527(d) before rejecting the opinion of a treating physician.   *Newton v.*

*Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

The ALJ thoroughly examined the records pertaining to Plaintiff's hip ailments,

noting Plaintiff's hearing testimony regarding his difficulty ambulating and his pain, the

opinions of Dr. Decherd, Dr. Ortiz, and Plaintiff's treating physician Dr. Gutzman as well

as Plaintiff's other treating and attending physicians in addition to the record both before

and after Plaintiff's hip revision surgeries.   (D.E. 11-3, Pages 22-28).

The ALJ, while stating he gave great weight to Dr. Gutzman's opinion, found that

Dr. Gutzman's December 20, 2011 and January 23, 2012 opinions that Plaintiff would

not be able to gain and maintain meaningful employment for at least a year and that

Plaintiff's physical restrictions would prevent him from even sedentary work were

entitled to little weight as Dr. Gutzman failed to state a reason for the one year limitation

or provide objective medical evidence in support of his opinions.   (D.E. 11-3, Page 27).

Further, the ALJ discounted Dr. Gutzman's March 28, 2012 opinion because it was given

two months post right hip revision and there was no record indicating that the limitations

described would continue for a continuous twelve month period as required for a

disability finding.[5]   As noted by the ALJ, both Dr. Ortiz and Dr. Decherd opined that

---

[5] As noted by the Plaintiff, the ALJ incorrectly stated there was no evidence of Plaintiff receiving
follow-up treatment with Dr. Gutzman after January 23, 2012.   (D.E. 11-3, Page 27).   However,
the record demonstrates Plaintiff was seen by Dr. Gutzman three times after this date.   (D.E. 11-
12, Pages 107-108 and D.E. 11-14, Page 41).   The ALJ did review Dr. Gutzman's March 28,

Plaintiff should have a six month recovery period after total hip replacement surgery. (D.E. 11-3, Page 25 and 43-44). Further, Dr. Rehman completed an RFC assessment on February 8, 2012, subsequent to both of Plaintiff's hip surgeries, and noted Plaintiff was unable to work due to bilateral hip surgeries, had to use crutches and take pain medication in the post operation stage, and his recommended RFC restricted Plaintiff on the basis of objective evidence while accounting for expected improvement and expected residuals after the revision surgery. (D.E. 11-8, Pages 144-145).

The ALJ further stated Plaintiff "after his revision surgeries, generally rated his pain level between 3/10 and 6/10. In March 2012, only two months post final hip revision surgery, he rated his pain level at 0." (D.E. 11-3, Page 26 and D.E. 11-13, Page 36). The record after Plaintiff's surgeries demonstrates Plaintiff's condition improved after surgery, including treatment notes from Dr. Gutzman. After his hip revision surgeries in October 2011 and January 2012, Dr. Gutzman noted Plaintiff's hip wound sites were well-healed with no signs of infection and Plaintiff reported his hip pain was lessening and was "controlled somewhat" with pain medication. (D.E. 11-8, Pages 36, 124, and 128-129).

By February 1, 2012, Plaintiff reported he was "doing well." (D.E. 11-11, Page 25). However, Plaintiff also reported pain as 7 out of 10 in his right hip, requested a pain

---

2012 opinion and treating records. (D.E. 11-3, Pages 23 and 27). Further, records for Plaintiff's two other office visits subsequent to January 23, 2012 with Dr. Gutzman demonstrate Plaintiff's hip replacements were in the proper positions with no loosening, Plaintiff was walking with less pain but was still using a cane, Plaintiff was "doing better in terms of his hip and he is now more active," and Plaintiff's pain level had decreased. Nothing in these records indicates Plaintiff's condition was not improving or the surgeries were unsuccessful.

medication refill and was noted as having an antalgic gait and walking with a cane. Plaintiff was advised to continue therapy and pain management.  (D.E. 11-11, Pages 25-26).   Three weeks later, Plaintiff is noted as, "Recently had Rt hip replaced—doing well—denies any new complaints." (D.E. 11-9, Page 119).  On March 6, 2012, Plaintiff was noted as ambulatory and rated his pain at 0 out of 10.  (D.E. 11-13, Pages 35-36). On March 28, 2012, Dr. Gutzman noted Plaintiff's hip replacements were in the proper positions with no loosening.  Plaintiff reported he was walking with less pain but was still using a cane.  Plaintiff's cobalt and chromium levels were noted as normal with definite improvements. By May 2012, Plaintiff was noted as walking without assistance and denying any new complaints regarding his hip pain.  (D.E. 11-13, Pages 32-33).

On September 26, 2012, Dr. Gutzman noted Plaintiff's laboratory results for chromium and cobalt were within normal limits and Plaintiff reported "[h]e is doing better in terms of his hip and he is now more active." (D.E. 11-12, Page 107).  Plaintiff's chief complaint on December 5, 2012, was chronic pain in his hips and knees which he assessed as five out of ten. (D.E. 11-15, Page 44).  At the hearing before the ALJ on February 5, 2013, Plaintiff testified he lives with his wife who does not work, he drives very rarely, he goes shopping with his wife to get out of the house and can lift grocery items so long as he did not have to bend to reach them, his hips, primarily his left, ache when it is cold, when he steps down wrong and on days when he is more active, and his pain medication assisted with the pain for a few hours but it caused concentration issues if he took enough to alleviate all of the pain. (D.E. 11-3, Pages 51-55).  Plaintiff further testified that when he performed household chores, he would have to take pain

medication and sit on the couch the next day.  (D.E. 11-3, Page 56).  Plaintiff further stated he would go fishing for an hour, it was difficult to walk back and forth in the sand, and he could not stand on the cement pier.  (D.E. 11-3, Page 59).  Subsequent to the hearing, on March 18, 2013, Dr. Gutzman noted Plaintiff's "pain level has decreased" and he would need to be seen on an as needed basis going forward.   (D.E. 11-14, Page 41).

This evidence demonstrates Plaintiff's hip ailments improved following surgery and, as determined by the ALJ, nothing in the record indicates the existence of an impairment that prevented him from performing substantial gainful activity for a continuous period of twelve months or more.  42 U.S.C. § 1382c.  Further, the opinions of Dr. Ortiz, Dr. Decherd and Dr. Rehman and the additional treatment notes discussed above support the ALJ's determination.  (D.E. 11-3, Pages 25 and 43-44 and D.E. 11-8, Pages 144-145).  As such, substantial evidence supports the ALJ's decision to discount the weight given to Dr. Gutzman's opinions.

## VI.  RECOMMENDATION

For the reasons stated above, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, the Commissioner's determination be **AFFIRMED**, and Plaintiff's cause of action be **DISMISSED**.

ORDERED this 14th day of July, 2015.

Jason B. Libby
United States Magistrate Judge

<u>NOTICE TO PARTIES</u>

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within **FOURTEEN (14) DAYS** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to 28 U.S.C. § 636(b)(1)(c); Rule 72(b) of the Federal Rules of Civil Procedure; and Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a Magistrate Judge's report and recommendation within **FOURTEEN (14) DAYS** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).